**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PHILLIP R. CORVELLO,
          *Plaintiff-Appellant*,

v.

WELLS FARGO BANK, NA, DBA
America's Servicing Company,
DBA Wells Fargo Home Mortgage,
Inc.,
          *Defendant-Appellee.*

No. 11-16234

D.C. No.
3:10-cv-05072-
JSW

KAREN LUCIA; JEFFREY LUCIA, on
behalf of themselves and all others
similarly situated,
          *Plaintiffs-Appellants*,

v.

WELLS FARGO BANK, NA, AKA
Wells Fargo Home Mortgage, Inc.,
          *Defendant-Appellee.*

No. 11-16242

D.C. No.
3:10-cv-04749-
JSW

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted
March 20, 2013—San Francisco, California

Filed August 8, 2013

Before: Mary M. Schroeder, John T. Noonan,
and Mary H. Murguia, Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge Noonan

## SUMMARY[*]

### Home Affordable Modification Program

The panel reversed the district court's dismissals of diversity actions challenging the decision of Wells Fargo Bank not to offer permanent mortgage modifications to plaintiff borrowers.

The panel held that under the Home Affordable Modification Program the bank was contractually required to offer the plaintiffs a permanent mortgage modification after they complied with the requirements of a trial period plan ("TPP"). The panel held that the district court should not have dismissed the plaintiffs' complaints when the record before it showed that the bank had accepted and retained the payments demanded by the TPP, but neither offered a

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

permanent modification, nor notified plaintiffs they were not entitled to one, as required by the terms of the TPP.

Judge Noonan concurred in the judgment.

## COUNSEL

Timothy G. Blood, Leslie E. Hurst (argued) and Thomas J. O'Reardon, II, Blood Hurst & O'Reardon, LLP, San Diego, California; Andrew S. Friedman, Elaine A. Ryan and Patricia N. Syverson, Bonnett, Fairbourn, Friedman & Balint, P.C., Phoenix, Arizona; Todd D. Carpenter, Bonnett, Fairbourn, Friedman & Balint, P.C., San Diego, California; James R. Patterson, Patterson Law Group, San Diego, California, for Plaintiff-Appellant Phillip R. Corvello.

Brian R. Strange, Gretchen Carpenter (argued) and Adrian R. Bacon, Strange & Carpenter, Los Angeles, California; Hernán Vera, Public Counsel, Los Angeles, California, for Plaintiffs-Appellants Karen Lucia and Jeffrey Lucia.

Matthew G. Ball, K&L Gates LLP, San Francisco, California; Irene C. Freidel (argued) and David D. Christensen, K&L Gates LLP, Boston, Massachusetts, for Defendant-Appellee.

## OPINION

PER CURIAM:

## INTRODUCTION

The U.S. Department of the Treasury, acting under the direction of Congress, launched the Home Affordable Modification Program ("HAMP") in 2009 to help distressed homeowners with delinquent mortgages, but the program seems to have created more litigation than it has happy homeowners. The issue we must decide is whether a bank was contractually required to offer the plaintiffs a permanent mortgage modification after they complied with the requirements of a trial period plan ("TPP"). The district court held the bank was not, and we reverse.

Similar issues have arisen in both state and federal courts. We now follow the Seventh Circuit's leading federal appellate decision, which came down after the district court's ruling in this case, to hold that the bank was required to offer the modification. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012). The district court should not have dismissed the plaintiffs' complaints when the record before it showed that the bank had accepted and retained the payments demanded by the TPP, but neither offered a permanent modification, nor notified plaintiffs they were not entitled to one, as required by the terms of the TPP.

## BACKGROUND

In response to the unfolding financial crisis of 2008, Congress passed the Emergency Economic Stabilization Act, Pub. L. No. 110-343, 122 Stat. 3765. This law included the

Troubled Asset Relief Program ("TARP"), "which required the Secretary of the Treasury, among many other duties and powers, to 'implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures.'" *Wigod*, 673 F.3d at 556 (quoting 12 U.S.C. § 5219(a)). Pursuant to this instruction, the Treasury Department in 2009 started the HAMP program to incentivize banks to refinance mortgages of distressed homeowners so they could stay in their homes. Home loan servicers, including Defendant-Appellee Wells Fargo Bank, N.A. ("Wells Fargo"), signed Servicer Participation Agreements with Treasury that entitled them to $1,000 for each permanent modification they made, but required them to follow Treasury guidelines and procedures.

The process of applying for and receiving a permanent modification plays out in several steps, as set forth in Treasury Supplemental Directive 09-01 ("SD 09-01"), the controlling Treasury guideline during the events leading to this suit. First, borrowers supply information about their finances and their inability to pay their current mortgage to the servicer, and the servicer must evaluate whether the borrowers qualify for a loan modification. SD 09-01. The servicer computes modified mortgage payments on the basis of the borrowers' information. *Id.*

For borrowers who appear eligible to participate in HAMP, the servicer then prepares a TPP. The TPP requires borrowers to submit documentation to confirm the accuracy of their initial financial representations, and to make trial payments of the modified amount to the servicer. The servicer must use the documentation to "confirm that the

borrower[s]" meet the eligibility criteria for a permanent modification. *Id.*

In the step most critical to this litigation, the servicer then must report to the borrowers the results of the eligibility determinations. *Id.* If a borrower does not qualify for the HAMP program, the servicer must not only alert the borrower, but must consider alternatives. The servicer should "promptly communicate that [ineligibility] determination to the borrower in writing and consider the borrower for another foreclosure prevention alternative." *Id.* For borrowers who have made all their payments and whose representations remain accurate, the servicer must offer a permanent home loan modification. *Id.*

Wells Fargo never offered plaintiffs Phillip Corvello and Karen and Jeffrey Lucia a modification. They filed separate actions against Wells Fargo, and their cases were consolidated. Their situations differ factually in that Corvello's dealings with Wells Fargo were in writing, while the Lucias dealt with the bank by phone. They both contend that they reached agreements with Wells Fargo whereby Wells Fargo was required to offer them permanent mortgage modifications if they complied with the requirements of their trial plans, including proving their eligibility for the permanent modification and making the trial payments. If they did not qualify for the modification, their agreements required Wells Fargo to alert them immediately and end the period of trial payments. They allege that they complied with their trial plans and made the required payments, and should have been offered permanent modifications.

The district court dismissed both actions under Rule 12(b)(6), so we accept the allegations of the complaints as

true. *Kahle v. Gonzales*, 487 F.3d 697, 699 (9th Cir. 2007). According to Corvello's complaint, he provided Wells Fargo with his financial information via a financial worksheet in June of 2009. Wells Fargo then sent him a TPP. The TPP stated in the first line that if Corvello's representations were accurate and he complied with the terms of the trial plan, he would receive a modification offer. The TPP also, and on the same page, assured him, as it was required to do by the applicable Treasury Directive, that the bank would tell him one way or another on his eligibility for a modification. It read:

> If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. . . . I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer.

Paragraph 2F of the TPP alerted the borrower to the obligations of the parties before there could be a permanent modification. It required, in addition to the borrower making the payments and maintaining the accuracy of the representations, that the servicer provide an executed copy of the TPP and Modification Agreement to the borrower. It stated as follows:

> If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate.

Paragraph 2G of the TPP stated that no modification would take effect until the borrower received a signed copy of the Modification Agreement. It read as follows:

> I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed. . . .

After Corvello signed and returned the TPP, and despite the notification representation on the first page of the TPP, Wells Fargo, according to the complaint, never told Corvello whether he qualified for a modification. Corvello alleges he complied with the TPP's terms, and made all three payments on time. Wells Fargo still never offered him a permanent modification, nor did it notify him that he did not qualify. He seeks the permanent modification offer allegedly due him under the TPP agreement, and damages for the payments he made to Wells Fargo.

The Lucias' interaction with Wells Fargo was materially similar to Corvello's experience. They allege that Wells Fargo offered them a trial plan, with the promise of a permanent modification if they fully complied. They made all of the required payments and submitted the documents requested by Wells Fargo. Despite performance of their obligations under the TPP, they, like Corvello, claim Wells Fargo neither offered them a permanent modification, nor alerted them that they were ineligible for a modification. Instead, Wells Fargo foreclosed on their home and sold it. Their complaint seeks rescission of the foreclosure, an offer of permanent modification, and damages.

The plaintiffs filed their complaints in United States District Court for the Northern District of California, invoking that court's diversity jurisdiction and seeking to apply California law. Their complaints alleged that because they complied with the obligations of their TPPs by submitting accurate documentation and making trial payments, there was an enforceable contract that bound the servicer, Wells Fargo, to offer permanent modifications.

The district court concluded that accepting the plaintiffs' allegations as true, the language of the TPP could not support a contract for a permanent loan modification. The court relied on Paragraph 2G of the TPP, which stated that the loan would not be modified "unless and until" the borrower received a "fully executed copy of a Modification Agreement." It concluded that under that provision, the bank's promise to offer a permanent modification was conditioned on the bank's sending the plaintiffs a signed Modification Agreement. Because the bank did not send the plaintiffs a signed Modification Agreement, the district court

ruled that the bank was not required to offer a permanent modification, and dismissed the claims for breach of contract.

Plaintiffs also alleged claims of promissory estoppel, breaches of the covenant of good faith and fair dealing, and violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and the Lucias further alleged a violation of the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788.17. Because all these claims depended on a promise by the bank to offer a permanent modification if the plaintiffs met the conditions of the TPP, the district court dismissed them as well, and without leave to amend. Both Corvello and the Lucias appeal the dismissal of all the claims.

## DISCUSSION

The issue we must decide is whether the bank was contractually obligated under the terms of the TPP to offer a permanent modification to borrowers who complied with the TPP by submitting accurate documentation and making trial payments. State and federal courts have dealt with similar issues, in similar factual circumstances, in a number of cases. *See Sutcliffe v. Wells Fargo Bank, N.A.*, 283 F.R.D. 533, 549–50 (N.D. Cal. 2012) (collecting cases).

The leading case on the contractual obligations of banks under TPP agreements is the Seventh Circuit's decision in *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012). That court held that banks were required to offer permanent modifications to borrowers who completed their obligations under the TPPs, unless the banks timely notified those borrowers that they did not qualify for a HAMP modification. *Id.* at 562–63. Other courts have since

followed the reasoning of *Wigod*. *See, e.g.*, *Young v. Wells Fargo Bank, N.A.*, No. 12-1405, 2013 WL 2165262, at \*6 (1st Cir. May 21, 2013); *Sutcliffe*, 283 F.R.D. at 549–52; *West v. JPMorgan Chase Bank, N.A.*, 154 Cal. Rptr. 3d 285, 299 (Ct. App. 2013).

The Seventh Circuit in *Wigod* rejected the very proposition that Wells Fargo asserts here, and which the district court accepted when it concluded that there was no contract. Wells Fargo contends, as it did in *Wigod*, that Paragraph 2G of the TPP means there can be no contract unless the servicer sends the borrower a signed Modification Agreement. It points to the language in 2G stating that "the Loan Documents will not be modified unless and until . . . (ii) [the borrower] receive[s] a fully executed copy of a Modification Agreement."

The Seventh Circuit rejected Wells Fargo's position because it made the existence of any obligation conditional solely on action of the bank, and conflicted with other provisions of the TPP, including the bank's promise to send the borrower a Modification Agreement if the borrower complied with the obligations under the TPP and the borrower's representations continued to be true. *Wigod*, 673 F.3d at 563. Wells Fargo's interpretation of the TPP was suspect because it allowed banks to avoid their obligations to borrowers merely by choosing not to send a signed Modification Agreement, even though the borrowers made both accurate representations and the required payments. As the Seventh Circuit put it, Wells Fargo's interpretation would allow it to "simply refuse to send the Modification Agreement for any reason whatsoever—interest rates went up, the economy soured, it just didn't like [the

Borrower]—and there would still be no breach . . . turn[ing] an otherwise straightforward offer into an illusion." *Id.*

We believe the reasoning in *Wigod* is sound. Paragraph 2G cannot convert a purported agreement setting forth clear obligations into a decision left to the unfettered discretion of the loan servicer. The more natural and fair interpretation of the TPP is that the servicer must send a signed Modification Agreement offering to modify the loan once borrowers meet their end of the bargain. Under Paragraph 2G of the TPP, there could be no actual mortgage modification until all the requirements were met, but the servicer could not unilaterally and without justification refuse to send the offer. As the Seventh Circuit stated in *Wigod*, the modification was not complete until all of the conditions were met, "but under paragraph 1 and section 3 of the TPP, Wells Fargo still had an obligation to *offer* [the borrower] a permanent modification once [the borrower] satisfied all [] obligations under the agreement." *Id.* (emphasis in original). This interpretation of the TPP avoids the injustice that would result were Wells Fargo's position accepted and Wells Fargo allowed to keep borrowers' trial payments without fulfilling any obligations in return. The TPP does not contemplate such an unfair result.

The Seventh Circuit in *Wigod* was applying Illinois contract law, and we deal with California law. There is now no material difference. In *West*, 154 Cal. Rptr. 3d at 299, the California Court of Appeal expressly adopted the reasoning of *Wigod* and concluded that the trial plan agreement in that case authorized banks, before offering a modification, to evaluate only whether borrowers had complied with the agreement's terms and whether their representations remained true. Once the bank determined that a borrower had

complied and the representations were still true, then the bank was required by the agreement to offer a permanent modification. *Id.*

Wells Fargo contends, however, that *West* is not controlling because it is not a California Supreme Court decision and there is a conflict in the California Courts of Appeal. Wells Fargo cites *Nungaray v. Litton Loan Servicing, LP*, 135 Cal. Rptr. 3d 442 (Ct. App. 2011), as proof of this conflict, but *Nungaray* does not apply because the borrowers there had failed to submit the documents required by the TPP. *Id.* at 447 (the bank never "receive[d] the Nungarays' complete financial information, despite sending the Nungarays' counsel three letters requesting the information and returning one of the Nungarays' payments for lack of accompanying financial information."). Where, as here, borrowers allege, and we must assume, that they have fulfilled all of their obligations under the TPP, and the loan servicer has failed to offer a permanent modification, the borrowers have valid claims for breach of the TPP agreement. *West*, 154 Cal. Rptr. 3d at 299 ("Applying *Wigod* to this case, '[a]lthough [Chase Bank] may have had some limited discretion to set the precise terms of an offered permanent modification, it was certainly required to offer *some* sort of good-faith permanent modification to [West] consistent with HAMP guidelines. It has offered none.'" (quoting *Wigod*, 673 F.3d at 565)).

Wells Fargo also contends that *Wigod* is materially distinguishable, pointing to Paragraph 2F in the TPPs which states, among other things, that the trial plan will end if the borrower does not receive a signed copy of the TPP. In *Wigod* the bank actually sent the plaintiffs a signed copy of the TPP.

*Wigod*'s holding, however, does not turn on that fact, but instead on the bank's failure to tell the borrowers that they did not qualify. The TPP gives the bank a chance, after borrowers submit the completed TPP, to notify them if they do not qualify. "Under the terms of the TPP Agreement, then, that moment [when Wells Fargo received the borrower's TPP] was Wells Fargo's opportunity to determine whether [the borrower] qualified. If [the borrower] did not, it could have and should have denied [the borrower] a modification on that basis." *Wigod*, 673 F.3d at 562. This notification obligation is also set out in the applicable Treasury Directive. If after receiving the TPP the bank determines that a borrower is not eligible for a modification, the bank should "promptly communicate that determination to the borrower in writing and consider the borrower for another foreclosure prevention alternative." SD 09-01. Wells Fargo's own failure to fulfill the notification obligation does not deprive plaintiffs of the benefits of their agreement.

Wells Fargo separately contends that the Lucias' breach of contract claim cannot survive the statute of frauds because it is an oral agreement to modify a mortgage. The Lucias, however, have alleged full performance of their obligations under the contract. They therefore may enforce the remaining promises. *See Secrest v. Sec. Nat'l Mortg. Loan Trust 2002-2*, 84 Cal. Rptr. 3d 275, 284–85 (Ct. App. 2008).

The Lucias' complaint also contains a claim for violation of California's Rosenthal Act, Cal. Civ. Code § 1788.17, the state's version of the federal Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692e, 1692f. Wells Fargo concedes it is a debt collector under the meaning of the Rosenthal Act. Wells Fargo contends, however, that it was not engaged in debt collection activities when it offered the TPP with its

concomitant demand for trial payments. The district court, while dismissing the claim on other grounds, correctly recognized that Wells Fargo was engaged in debt collection. The TPP was more than an informational circulation. This is the same conclusion reached by other district courts. *See In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig.*, No. 10-MD-02193-RWZ, 2011 WL 2637222, at \*6 (D. Mass. July 6, 2011); *cf. Reyes v. Wells Fargo Bank, N.A.*, No. C-10-01667JCS, 2011 WL 30759, at \*20 (N.D. Cal. Jan. 3, 2011).

As a final matter, we must reiterate that the district court granted Wells Fargo's motion to dismiss the complaints under Rule 12(b)(6), so we therefore must accept the allegations of the complaints. In oral argument, Wells Fargo indicated that it did in fact determine that the plaintiffs were not qualified, and thus followed Treasury guidelines in choosing not to offer them permanent modifications. SD 09-01. We are unable to consider any such factual assertion on this record and at this stage of the proceedings. We are in the same position as the Seventh Circuit when it posited that Wells Fargo would offer this sort of defense, and similarly concluded that such a defense "presents a factual dispute that cannot be resolved [at the motion to dismiss stage]." *Wigod*, 673 F.3d at 579. We therefore must reverse the judgment and remand the case for further proceedings.

## CONCLUSION

The district court's judgment granting Wells Fargo's motion to dismiss is **REVERSED** and **REMANDED**.

NOONAN, Circuit Judge, concurring:

Read as a whole the TPP between Corvello and Wells Fargo makes no sense. It is self-contradictory. Page one promised Corvello in two places that if his representations were accurate and if he were in compliance with the Trial Period Plan, the Lender "would provide" him "with a Loan Modification Agreement." Paragraph 2G stated: "the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification; (ii) I receive a fully executed copy of a Modification Agreement and (iii) the Modification Effective Date has passed."

Wells Fargo drafted this document, and Wells Fargo must be held responsible for it. The document promises a substantial benefit to Corvello if he meets its terms. The document then makes these benefits illusory because they depend entirely on the will of Wells Fargo. To say, "I give $100 for your watch but I will decide whether I pay you $100" is not to make a contract but to engage in a flim-flam or, in plain words, to work a fraud. You promise so that the other will perform. You reserve your promise so that the promise is empty while you have gotten what you wanted from the promisee.

No purpose was served by the document Wells Fargo prepared except the fraudulent purpose of inducing Corvello to make the payments while the bank retained the option of modifying the loan or stiffing him. "Heads I win, tails you lose" is a fraudulent coin toss. Wells Fargo did no better.

According to the Lucias' complaint, their dealings with Wells Fargo were oral. Ms. Lucia "was interviewed by phone and pre-approved for the [HAMP loan] modification." She

was informed that if she and her husband "sent in all the required documents and made all their payments on time, their reduced monthly payment would become permanent." The Lucias allege that they made their "trial period plan payments as scheduled."  The bank foreclosed.  These allegations are sufficient to make the Lucias' position analogous to Corvello's.

Confined as we are to the pleadings before us, I concur in the judgment of the court.