Filed 1/23/14  Haritunian v. Wells Fargo Bank CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| ARA HARITUNIAN,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>WELLS FARGO BANK, N.A. et al.,<br><br>    Defendants and Respondents. | B247250<br><br>(Los Angeles County<br> Super. Ct. No. BC476137) |


APPEAL from a judgment of the Superior Court of Los Angeles County, Terry A. Green, Judge.  Affirmed.

Pacific Atlantic Law Corporation and Chinye Uwechue-Akpati for Plaintiff and Appellant.

Severson & Werson, Jan T. Chilton and Kerry Franich for Defendants and Respondents.

In a case engendered by the 2008 housing crisis and the ensuing Home Affordable Modification Program (HAMP),[1] Ara Haritunian appeals from the judgment entered after the trial court sustained without leave to amend demurrers to his second amended complaint. Haritunian sued Wells Fargo Bank, N.A. and Wells Fargo & Co. (collectively Wells Fargo) for breach of contract and other related claims, based upon a purported mortgage modification agreement. The trial court found that Haritunian failed to state a claim and entered a judgment of dismissal. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The allegations of Haritunian's second amended complaint are as follows.[2]

Haritunian owned a residence in La Verne, California, encumbered by what he described in his complaint as "[t]wo mortgages (a first and a second) covered by three title deeds (the second mortgage consisted of two deeds)." Exhibits in the record indicate that the first loan was a traditional home mortgage for $140,000, secured by a deed of trust. In addition, there were two home equity lines of credit, one for $372,000 and the other for $55,000, both secured by deeds of trust.

---

[1]     "As authorized by Congress, the United States Department of the Treasury implemented the Home Affordable Mortgage Program (HAMP) to help homeowners avoid foreclosure during the housing market crisis of 2008. 'The goal of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt.' [Citation.]" (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 785.)

[2]     In reviewing the order sustaining the demurrer, we accept the factual allegations of the complaint as true. (*Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 55 (*Lueras*).) If the facts alleged in the complaint conflict with an exhibit, the contents of the exhibit take precedence. (*Id.* at p. 56.)

After Haritunian's father was diagnosed with cancer in September 2008 and his sister diagnosed with cancer in January 2009, he requested a loan modification from Wells Fargo. Haritunian explained that he was taking care of two relatives with cancer and needed to stay in his home, which was close to the clinic where they received cancer treatment. Wells Fargo indicated that it would assist him in obtaining a loan modification.

After numerous phone calls to different Wells Fargo offices, Haritunian spoke with a Wells Fargo representative named Terry Hensley. In March 2010, Hensley told Haritunian that his first mortgage had been modified and that Haritunian would receive the paperwork in a few days. As a condition of the modification, Wells Fargo established an impound account for property taxes and insurance, and Haritunian made payments to the impound account. Haritunian never received the documents modifying the loan, despite several reassurances from Wells Fargo that they would be mailed. He was told to continue making the modified payments even though he never received the documentation.

Haritunian spoke with a different Wells Fargo representative, Toni Frazier, who agreed to modify the second mortgage "which consisted of two loans (equity lines of credit)." Frazier told Haritunian that she would make the modifications permanent if he made timely payments for six consecutive months. According to the complaint, "Wells Fargo agreed to accept a fifty percent reduction on each loan with an[] additional reduction of $50," resulting in monthly payments of $91.64 on one loan and $617.03 on the second. Haritunian made these payments to Wells Fargo for six consecutive months, believing that the modification then became permanent. However, Wells Fargo subsequently placed on the door of Haritunian's residence a notice of default and election to sell under the deed of

3

trust securing the $372,000 line of credit. The notice of default stated that Haritunian owed $14,214.47 as of May 26, 2010.

Haritunian alleged that when he first contacted Wells Fargo in late 2008, he had good credit and over $120,000 in savings, which would have been sufficient to enable him to move to a less expensive residence near the medical facility where his family members received cancer treatment. He averred that, had Wells Fargo not deceived him with the promise of a loan modification, he would have sold the house and moved when he still had sufficient funds and good credit in order to continue living near the medical facility. Haritunian further alleged that Wells Fargo intentionally deceived him into believing that documentation of the loan modification would be mailed to him in order to "milk" him of his funds.

Haritunian asked Wells Fargo for an explanation of the $14,214.47 figure that the notice of default alleged he owed, but Wells Fargo did not provide an explanation. He told Wells Fargo repeatedly that the amount was incorrect and offered to pay any amount due after receiving credit for the payments he had been making, but Wells Fargo did not respond.

Haritunian filed for bankruptcy in September 2010 and filed this lawsuit in January 2012. The trial court sustained with leave to amend Wells Fargo's demurrer to Haritunian's first amended complaint.

The second amended complaint is the operative complaint. Haritunian alleged nine causes of action: (1) breach of contract; (2) mistake/rescission; (3) fraud/intentional misrepresentation; (4) negligent misrepresentation; (5) fraudulent business practices in violation of Business and Professions Code section 17200 et seq.; (6) negligence; (7) violation of Business and Professions Code section 17500; (8) intentional infliction of emotional distress; and (9) negligent infliction of emotional distress. Wells Fargo filed a demurrer.

4

Haritunian filed an ex parte application for an order staying all mortgage payments to Wells Fargo until the lawsuit was resolved. In November 2012, the court ordered a stay of foreclosure proceedings for at least 60 days and ordered the parties to meet and confer regarding the amount Haritunian had paid to Wells Fargo. After the meeting, counsel filed declarations indicating their disagreement regarding the result of their meeting.

Haritunian subsequently filed a document listing all his payments to Wells Fargo. Wells Fargo filed an opposition to Haritunian's application to stay all mortgage payments.

On February 28, 2013, the court sustained Wells Fargo's demurrer without leave to amend. Appellant filed a notice of appeal. The court entered judgment in favor of Wells Fargo, dismissing the case.

## DISCUSSION

Haritunian contends that the trial court erred in sustaining Wells Fargo's demurrer without leave to amend. We disagree and therefore affirm.

In reviewing a complaint to which a demurrer has been sustained, "we must assume the truth of all facts properly pleaded by the plaintiff and matters properly judicially noticed. [Citation.] However, we 'do not assume the truth of contentions, deductions, or conclusions of fact or law and may disregard allegations that are contrary to the law or to a fact which may be judicially noticed.' [Citation.]" (*Haro v. City of Solana Beach* (2011) 195 Cal.App.4th 542, 549.) In addition, although we "assume the truth of the allegations in the complaint[,] . . . [t]he allegations that we accept as true necessarily include the contents of any exhibits attached to the complaint, and in the event of a conflict between the pleading and an exhibit, the facts contained in the exhibit take

5

precedence over and supersede any inconsistent or contrary allegations in the pleading. [Citation.]" (*Jibilian v. Franchise Tax Bd.* (2006) 136 Cal.App.4th 862, 864, fn. 1 (*Jibilian*).)

Haritunian argues that the facts alleged in the demurrer show valid causes of action against Wells Fargo, but his opening brief does not specifically address any cause of action. Wells Fargo contends that Haritunian has raised only his breach of contract claim and forfeited the other causes of action. Haritunian replies that the complaint sufficiently alleged all the causes of action, but his reply brief focuses on the argument that Wells Fargo agreed to permanently modify the payments on the lines of credit after his six months of modified payments. His briefs' reliance on *Corvello v. Wells Fargo Bank, NA* (9th Cir. 2013) 728 F.3d 878 (*Corvello*), which addressed the borrowers' claims that the lender breached a contract to offer a permanent mortgage modification, further indicates that he has raised only his breach of contract claim.

We find that Haritunian has sufficiently raised only his breach of contract claim. "'"Although our review of a [demurrer] is de novo, it is limited to issues [that] have been adequately raised and supported in [the appellant's] brief. [Citations.] Issues not raised in an appellant's brief are deemed waived or abandoned. [Citation.]"' [Citation.] An appellate court 'will not develop the appellants' arguments for them. . . .' [Citation.]" (*Pfeifer v. Countrywide Home Loans, Inc.* (2012) 211 Cal.App.4th 1250, 1282.) Haritunian's briefs do not develop any arguments as to his other claims and therefore those claims are deemed waived.

As to the contract claim, Haritunian contends that his case is similar to *Corvello*, which addressed whether the bank was required to offer the plaintiffs a permanent mortgage modification after they complied with the requirements of a

6

trial period plan (TPP). *Corvello* involved two consolidated cases, one set of plaintiffs having dealt with the bank in writing and the other by phone. Both sets of plaintiffs contended they had complied with the requirements of their trial plans by making their trial payments and proving their eligibility for the permanent modification. The bank never offered the plaintiffs a permanent modification nor notified them that they were ineligible and, as to the plaintiffs who communicated by phone, foreclosed on their home. The lower court dismissed both actions for failure to state a claim.

The Ninth Circuit Court of Appeals rejected the bank's argument that there was no contract because the bank did not send the borrowers a signed modification agreement as required by one paragraph in the TPP. (*Corvello*, *supra*, 728 F.3d at p. 883.) The court reasoned that the bank's argument would allow the bank to avoid its obligations merely by choosing not to send the modification agreement, "even though the borrowers made both accurate representations and the required payments." (*Ibid*.) Such a holding would "convert a purported agreement setting forth clear obligations into a decision left to the unfettered discretion of the loan servicer." (*Ibid.*) Because the borrowers alleged that they fulfilled all their obligations under the TPP, and the bank failed to offer a permanent modification, the court held that the borrowers had asserted valid claims for breach of the TPP agreement. (*Id.* at p. 884.) The court rejected the bank's attempt to rely on the statute of frauds as to the plaintiffs who had only an oral agreement, on the basis that they had alleged full performance of their obligations under the contract. (*Id.* at p. 885, citing *Secrest v. Security National Mortgage Loan Trust 2002-2* (2008) 167 Cal.App.4th 544 (*Secrest*).) The court thus reversed the judgment granting the bank's motion to dismiss. (*Ibid.*)

7

As we explain, *Corvello* is distinguishable from Haritunian's case. Unlike the plaintiffs in *Corvello*, Haritunian's full performance under the alleged oral contract is insufficient to take the agreement out of the statute of frauds because Haritunian was required only to pay money. (*Secrest*, *supra*, 167 Cal.App.4th at p. 556 [payment of money insufficient to constitute performance so as to take contract out of the statute of frauds].) In addition to this distinction, as we also explain, we find a separate basis on which to affirm the dismissal of Haritunian's complaint. Exhibits in the record are inconsistent with Haritunian's allegation that the loan modification was to become permanent after six months, and, in such a situation, the contents of the exhibit take precedence. (*Lueras*, *supra*, 221 Cal.App.4th at p. 55.)

"An agreement for the sale of real property or an interest in real property comes within the statute of frauds. (Civ. Code, § 1624, subd. (a)(3).) A mortgage or deed of trust also comes within the statute of frauds." (*Secrest*, *supra*, 167 Cal.App.4th at p. 552.) "A contract coming within the statute of frauds is invalid unless it is memorialized by a writing subscribed by the party to be charged or by the party's agent. (Civ. Code, § 1624.) Under Civil Code section 1624, the party to be charged means "'the party to be charged in court with the performance to the obligation, i.e., the *defendant* in the action brought to enforce the contract.'" [Citation.]" (*Ibid.*) Moreover, "[a]n agreement to modify a contract that is subject to the statute of frauds is also subject to the statute of frauds. [Citations.]" (*Id.* at p. 553.)

"Courts, however, 'have the power to apply equitable principles to prevent a party from using the statute of frauds where such use would constitute fraud.' [Citation.]" (*Chavez v. Indymac Mortgage Services* (2013) 219 Cal.App.4th 1052, 1057-1058 (*Chavez*).) Part performance and equitable estoppel are two separate

8

grounds for avoiding the statute of frauds. (*Byrne v. Laura* (1997) 52 Cal.App.4th 1054, 1072.)

"Part performance allows enforcement of a contract lacking a requisite writing in situations in which invoking the statute of frauds would cause unconscionable injury. [Citation.]" (*Secrest*, *supra*, 167 Cal.App.4th at p. 555.) However, "'[t]he payment of money is not "sufficient part performance to take an oral agreement out of the statute of frauds" [citation], for the party paying money "under an invalid contract . . . has an adequate remedy at law."' [Citations.]" (*Ibid.*) In addition, "[t]he principle that full performance takes a contract out of the statute of frauds has been limited to the situation where performance consisted of conveying property, rendering personal services, or doing something other than payment of money." (*Id.* at p. 556.)

Pursuant to *Secrest*, Haritunian's performance in the form of modified payment amounts is not sufficient to estop Wells Fargo from asserting the statute of frauds. Haritunian has not alleged that he did anything other than make modified payments in order to obtain the permanent modification. Unlike the plaintiffs in *Corvello* who, in addition to making the required payments, submitted documentation to the bank regarding their eligibility for a permanent modification, Haritunian did not allege that he was required to provide any type of documentation in order to qualify for the loan modification. Even if Haritunian fully performed his obligations under the alleged contract by making modified payments, this performance did not require him to do something other than pay money, which *Secrest* instructs is insufficient to take the contract out of the statute of frauds. (*Secrest*, *supra*, 167 Cal.App.4th at p. 556.)

"'Without the qualifying doctrine of estoppel in a proper case the statute would encourage rather than prevent the perpetration of frauds.' [Citation.]

9

Accordingly, equitable estoppel may preclude the use of a statute of frauds defense. [Citation.] "'The doctrine of estoppel has been applied where an unconscionable injury would result from denying enforcement after one party has been induced to make a serious change of position in reliance on the contract or where unjust enrichment would result if a party who has received the benefits of the other's performance were allowed to invoke the statute.'" [Citation.] Generally, 'four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' [Citation.] Whether a party is precluded from using the statute of frauds defense in a given case is generally a question of fact. [Citation.]" (*Chavez, supra*, 219 Cal.App.4th at p. 1058.)

As to the question of whether Haritunian made a serious change of position in reliance on the alleged contract, Haritunian alleged in his complaint that, when he first contacted Wells Fargo, he had good credit and sufficient funds to move, and he would have done so had he known that Wells Fargo would not offer him a permanent modification. He also alleged that his condominium was worth more when he first contacted Wells Fargo and that he had $120,000 in savings, which would have enabled him to move to a less expensive residence near the medical facility. By agreeing to modify the loans, Wells Fargo allegedly induced him to believe that he would be able to remain in his home and therefore did not need to move.

Haritunian's allegations do support a claim that he changed his position in reliance on Wells Fargo's alleged promise to make the loan modification

10

permanent. His allegations are similar to those in *Chavez*, where the homeowner argued that she reasonably relied on the lender's promises in a modification agreement to her detriment by "not seeking help elsewhere to save her home."[3] (*Chavez, supra*, 219 Cal.App.4th at p. 1063.) The court found that the "proposed allegation that she did not seek help elsewhere to save her home provide[d] additional detrimental reliance supporting [her] claim that Defendants should be equitably estopped to rely on the statute of frauds defense." (*Id.* at p. 1064.) Haritunian's allegations that he could have used his savings and moved to a less expensive residence while he still had good credit, support the claim that he did rely to his detriment on Wells Fargo's purported agreement to modify his loans.

Nonetheless, we need not determine whether Haritunian has sufficiently alleged equitable estoppel to defeat the statute of frauds defense because exhibits in the record are inconsistent with his claim that the loan modification was to become permanent after six payments. Although we are to accept as true the allegations of the complaint, "in the event of a conflict between the pleading and an exhibit, the facts contained in the exhibit take precedence over and supersede any inconsistent or contrary allegations in the pleading. [Citation.]" (*Jibilian, supra*, 136 Cal.App.4th at p. 864, fn. 1.)

In a declaration filed in his bankruptcy case, Haritunian states that he has attached "true, correct and complete documentation" of the trial loan modification.[4]

---

[3] The argument was made to support her claim that the trial court erred in not allowing her leave to amend to add a cause of action for promissory estoppel. (*Chavez, supra*, 219 Cal.App.4th at p. 1063.) Haritunian did not allege promissory estoppel, and the record does not indicate that he sought leave to amend the complaint to add the cause of action. Nor has he raised such a claim on appeal.

[4] These documents were attached as an exhibit to Wells Fargo's reply to Haritunian's opposition to the demurrer to the complaint.

The documentation includes two letters dated June 29, 2009 from Wells Fargo to Haritunian, one for the first line of credit and other for the second line of credit. The letters are form letters, identical in all respects except that the first states that the home equity payment was lowered to $617.03, and the second states that the payment was lowered to $91.64. The letters state, in pertinent part, as follows: "Thank you for letting us know about your efforts to qualify for the *Making Home Affordable (MHA)* modification program for your first lien home mortgage. [¶] As we discussed, we are pleased to confirm that while you are going through the Qualification Period (the time you are working with your first lien lender to qualify for your MHA modification), we are lowering the payments on your home equity account. This Reduced Payment Program is designed to give certain home equity customers temporary and immediate assistance during difficult times." The letters then describe the program: "During the Qualification Period, we are lowering your home equity payment to $617.03 [or $91.64]. Although your home equity statement may show a higher minimum payment amount, you will only be required to make payments in the amount shown above during your first mortgage Qualification Period. . . . [¶] Although your payments will be temporarily lower during the Qualification Period, you will still be responsible for the full amount of your balance and any past due amounts according to the original terms of your home equity account agreement. If you are not approved for your MHA first mortgage modification, the original payment amount set forth in your account agreement will resume."

Haritunian also attached Wells Fargo transaction records, indicating his payment of the trial amounts for six months. However, the subsequent exhibit in the record is an October 19, 2009 letter from Wells Fargo to Haritunian's counsel, stating: "The home equity Reduced Payment Program was designed to give your

12

client immediate temporary assistance on your client's home equity payments during the Qualification Period with your client's first lien servicer for a modification under [HAMP]. [¶] However, due to your client's inability to comply with the terms and conditions of the Reduced Payment Program, your client's enrollment has now been terminated."

The June 2009 letters indicate that, although Haritunian was offered reduced payments on his lines of credit, the modification was temporary and applied only during the so-called "Qualification Period," while he attempted to obtain a modification of his first lien, the $140,000 mortgage. He alleged in his complaint that, in March 2010, a Wells Fargo representative named Terry Hensley told him his first mortgage had been successfully modified. The October 2009 letter, however, indicates that the temporary reduction in payment amounts on his lines of credit already had been terminated. The letter terminating the reduced payment plan is inconsistent with the allegation that Wells Fargo promised to make the reduced payments permanent. The contents of these exhibits take precedence over the facts alleged in the complaint. (*Lueras*, *supra*, 221 Cal.App.4th at p. 56.) We therefore conclude that the trial court did not err in sustaining the demurrer as to the breach of contract claim. Haritunian has failed to raise the other causes of action.

## DISPOSITION

The judgment is affirmed.  Respondents are entitled to their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.


We concur:


MANELLA, J.


EDMON, J.*


*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant

14

to article VI, section 6 of the California Constitution.