In the

# United States Court of Appeals
### For the Seventh Circuit

No. 17-3019

ANTHONY G. TAYLOR,

*Plaintiff-Appellant,*

*v.*

JPMORGAN CHASE BANK, N.A.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division at Lafayette.
No. 4:16-cv-52 — **Rudy Lozano**, *Judge.*

ARGUED SEPTEMBER 5, 2019 — DECIDED APRIL 30, 2020

Before SYKES, HAMILTON, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Anthony Taylor is one of many
homeowners who fell behind on their mortgage payments
during the 2008 subprime mortgage crisis and sought help
under the Home Affordable Mortgage Program. HAMP was
a Treasury Department program that allowed eligible home-
owners to reduce their monthly mortgage payments in an ef-
fort to avoid foreclosure. The first step toward a permanent
loan modification was for qualifying borrowers to enter into

a Trial Period Plan with their lenders and make lower pay-
ments on a provisional basis.

Taylor's lender, JPMorgan Chase, informed him of the
HAMP opportunity and sent him a proposed TPP agreement
to be signed and returned to the bank to get the process
started. That agreement contained a provision stating that the
trial period would not begin until both parties signed the TPP
and Chase then returned to Taylor a copy bearing its signa-
ture. Taylor signed the proposed agreement, but Chase never
did, and Taylor's loan was never modified. Taylor later sued
Chase, contending that the bank failed to honor its loan-mod-
ification offer.

The district court found that the facts as Taylor had alleged
them in his complaint and a later proposed amended com-
plaint did not suffice to state a claim, so it granted judgment
on the pleadings for Chase and denied as futile Taylor's re-
quest to amend the complaint. The key shortcoming on the
breach of contract claim, the district court concluded, was
Taylor's failure to allege that Chase had signed and returned
a copy of the TPP—a condition precedent to enrolling him in
the trial period. We agree and affirm.

**I**

A brief introduction to the Home Affordable Modification
Program, or HAMP, will prove helpful. Congress enacted the
Emergency Economic Stabilization Act in 2008 as a response
to the disaster then unfolding in the financial markets. The
statute provided for the Troubled Asset Relief Program, un-
der which the Secretary of the Treasury was to assist home-
owners and minimize foreclosures. See 12 U.S.C. § 5219(a)(1).
As part of that endeavor, the Secretary provided financial

incentives to banks in exchange for allowing struggling homeowners to refinance their mortgages. HAMP was one such program. Only certain borrowers were eligible, and those who were had to complete two steps to receive a permanent loan modification. First, qualifying borrowers entered a Trial Period Plan, or TPP, with the lender. Borrowers made reduced payments during that specified time. If the borrower complied with the terms of the TPP, the lender would then offer a permanent loan modification. With that background in mind, we turn to the facts Anthony Taylor alleged in his complaint against Chase.

A

Taylor held a mortgage with JPMorgan Chase and like many others, he missed payments during the financial crisis. But in August 2009, a lifeboat came into view when a Chase representative called and told Taylor he prequalified for assistance under HAMP.

Shortly thereafter Taylor received paperwork from Chase that provided more details about HAMP and instructions for how to move forward in the process. Taylor attached a copy of those documents to his complaint. See FED. R. CIV. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). The bank's cover letter explained that Taylor "may qualify" for a TPP, adding that if he proved eligible and complied with the trial-period terms, Chase would permanently modify his loan and allow him to avoid foreclosure. To accept the offer proposed by the TPP, the letter instructed Taylor to "return[] the signed Trial Period Plan, along with other required documents and first payment" and to complete the other steps described in an appended checklist.

Attached to the cover letter was a list of Frequently Asked Questions. The answer to one question explained that it might take "up to 30 days" for Chase to receive and review Taylor's documents, with the bank then processing any modification request "as quickly as possible." The answer to another provided that if Taylor "d[id] not qualify for the program" then his "first trial payment [would] be applied to [his] existing loan in accordance with the terms of [his] loan documents."

Then there was the TPP document itself. It provided that Taylor's trial period would last three months—from September to November 2009—during which he had to make monthly payments of $372. It further stated, however, that the proposed TPP agreement would "not take effect unless and until both [Taylor] and [Chase] sign it and [Chase] provides [Taylor] with a copy of this Plan with [Chase's] signature." Moreover, no permanent modification would result if "[Chase] does not provide [Taylor] a fully executed copy of this Plan and the Modification Agreement" before the "Modification Effective Date." The TPP concluded with two signature lines—one for Taylor and another for Chase.

Taylor wrote his name on the dotted line and returned the TPP to Chase together with the other required documents and his first of the three payments. From there, however, the bank never returned a fully executed copy of the TPP to Taylor. Instead, Chase sent Taylor multiple notices that his HAMP modification was in jeopardy because he had not provided the bank with the necessary supporting paperwork. For his part, Taylor believed he had already sent the requested documents, but he went ahead and resent them to be certain. He then continued making the modified payments, timely submitting all three required by the terms of the TPP. Yet the trial

period came and went and Taylor received no permanent modification of his loan.

B

Based on those allegations, Taylor sued Chase in Indiana state court, asserting claims for breach of contract and promissory estoppel. He represented himself in the proceedings. Chase removed the suit to federal court and then moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). The bank attached to its motion a May 2010 letter informing Taylor that he did not qualify for HAMP because the ratio of his monthly housing expense to his gross monthly income did not meet the requirement for permanent loan modification.

Once briefing on Chase's motion was underway, Taylor submitted a motion of his own. He requested leave to modify his pleading and attached the amended complaint he sought to file. The proposed amended complaint added two new claims under Indiana law—one for fraud, based on an allegation that Chase misrepresented the status of his HAMP modification, and another for the intentional infliction of emotional distress.

The amendment added detail about Taylor's communications with Chase during the trial period. Taylor clarified that the initial call he received from Chase about his HAMP prequalification came from someone named Chris Montgomery. Taylor alleged that Montgomery "verbally offered" a HAMP trial period modification, which Taylor then accepted before the call concluded. The following month, after he sent in the required paperwork, Taylor spoke with Montgomery once again, this time to ask about the status of his

modification and when he could expect to receive the countersigned and fully executed TPP from the bank. Montgomery responded that the documents were "in receipt for processing" and he "did not know of any situation in which Chase returns fully executed copies of TPP agreements to customers."

In his proposed amended complaint, Taylor also added that he followed up on his application a couple of weeks later and a different Chase representative told him his documents had been received and were being forwarded to a supervisor. In November 2009, yet another representative informed Taylor that his file was being sent to an analyst for "pre closing." Taylor maintained that the combined effect of these statements by Chase's representatives waived any condition precedent that otherwise required the bank to countersign and return a fully executed version of the TPP before enrolling him in the trial-modification plan.

## C

The district court referred Chase's motion for judgment on the pleadings and Taylor's motion to amend his complaint to a magistrate judge. The magistrate then recommended granting the former and denying the latter as futile. In doing so, the magistrate considered the allegations in both the original complaint and the proposed amended complaint all at once, concluding that none sufficed to state a claim.

The district court agreed and adopted the magistrate's recommendation. The court held that Taylor's complaint failed to allege the existence of a binding agreement with Chase, an essential element of any breach of contract claim. "[B]ecause Chase never signed and returned the agreement," the court

explained, "there was no offer, and no contract was ever created." Taylor's promissory estoppel claim fared no better, since the court found that he had not pleaded that he had relied to his detriment on any promise made by Chase. Nor did Taylor's allegations support his proposed claims for fraud or intentional infliction of emotional distress. Summing each of these conclusions, the court entered judgment in favor of Chase, and Taylor appealed.

**II**

We review the district court's judgment on the pleadings *de novo*, and, because the district court denied Taylor's request to amend the complaint on futility grounds, we apply the same standard to that decision. See *Dennis v. Niagara Credit Sols., Inc.*, 946 F.3d 368, 370 (7th Cir. 2019); *Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017). We accept Taylor's factual allegations as true and draw reasonable inferences from them in his favor. See *Dennis*, 946 F.3d at 370; *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Indiana*, 786 F.3d 510, 526 (7th Cir. 2015). We likewise construe Taylor's pleadings liberally since he drafted them *pro se*. See *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015).

The district court's two decisions—one regarding judgment on the pleadings and the other concerning the futility of amendment—ask the same question: whether Taylor "state[d] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); see also *Heng*, 849 F.3d at 351 (applying the same standard); *Landmark Am. Ins. Co. v. Hilger*, 838 F.3d 821, 824 (7th Cir. 2016). To meet that threshold, Taylor must "plead[] factual content that allows the court to draw the reasonable inference that [Chase] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Facts that are "merely consistent with" liability are insufficient. *Id*. (quoting *Twombly*, 550 U.S. at 557).

Because the standards for the district court's two decisions are the same and the court analyzed them together, we follow that lead and review them both at once, considering the allegations in the proposed amended complaint along with those in Taylor's original, operative complaint.

### III

### A

We begin with Taylor's breach of contract claim, which, as its name implies, requires a plaintiff to allege the existence of an enforceable contract. See *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012). Indiana law requires of a contract the same elements drilled into first-year law students—an offer, acceptance, and consideration. See *Indiana Dep't of Corr. v. Swanson Servs. Corp.*, 820 N.E.2d 733, 737 (Ind. Ct. App. 2005). Put more simply, each party must communicate to the other its willingness to enter a contract. *Id.*; see also RICHARD A. LORD, WILLISTON ON CONTRACTS § 4:1 (4th ed.). The agreement comes into existence when one party (the offeror) extends an offer, and the other (the offeree) accepts the offer and its terms. See *Swanson Servs.*, 820 N.E.2d at 737.

The offeror can qualify an offer and hold an agreement in abeyance until a condition is fulfilled. See *Allen v. Cedar Real Estate Grp., LLP*, 236 F.3d 374, 381 (7th Cir. 2001) (applying Indiana law); *Zimmerman v. McColley*, 826 N.E.2d 71, 77 (Ind. Ct. App. 2005). These so-called conditions precedent are common and well accepted in contract law. For example, an offeror may include what is known as a "condition of subsequent approval," reserving the last word in the form of a right to give

final consent after the offeree conveyed agreement to the proposed arrangement. WILLISTON § 4:27. Other examples of conditions precedent include a specification that the offeror must give final approval in writing, see, *e.g.*, *Wolvos v. Meyer*, 668 N.E.2d 671, 675 (Ind. 1996), or qualifying that the offeror must first receive more information, see, *e.g.*, *Allen*, 236 F.3d at 381–82.

If an offer contains a condition precedent, a contract does not form unless and until the condition is satisfied. See *Allen*, 236 F.3d at 381 (7th Cir. 2001); WILLISTON § 38:7. The reason is because an offeror cannot be said to have agreed to the terms if the occurrence on which the party conditioned any agreement has not yet come to pass. See WILLISTON § 4:27. By way of simple everyday illustration, consider used car transactions, where buyers condition offers on vehicles being in good working order. A car then shown to have a transmission problem would allow the buyer to walk away, for the condition precedent—good working order—was not satisfied. The same is true even if the offeree has already agreed to the offer, since he agreed to an offer accompanied by the condition precedent. See WILLISTON § 38:7 ("[W]hen the parties to a proposed contract have agreed that the contract is not to be effective or binding until certain conditions are performed or occur, no binding contract will arise until the conditions specified have occurred or been performed.").

These principles find straightforward application here. The TPP unambiguously stated that the trial modification would "not take effect unless and until both [Taylor] and [Chase] sign it and [Chase] provides [Taylor] with a copy of this Plan with [Chase's] signature." And if Chase did "not provide [Taylor] a fully executed copy of this Plan and the

Modification Agreement," then "the Loan Documents will not be modified and this Plan will terminate." This language is clear and precise and created a condition precedent that required Chase to countersign the TPP and return a copy to Taylor before the trial modification commenced. See generally *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 850 (8th Cir. 2014) ("That Chase was to sign and return the fully executed Agreement to Topchian is more properly characterized as a condition precedent.").

Taylor reads the same language differently, characterizing the provisions not as establishing a condition precedent but rather providing a means for Chase to communicate its assent. But we give effect to the intent expressed within the TPP's four corners, see *Allen*, 236 F.3d at 381, and the words could not be clearer—the trial-period agreement would "not take effect" unless the countersignature and return occurred. All agree that Chase never took those steps. With the condition precedent unmet, the proposed TPP agreement never became a contract binding on the parties.

The unfulfilled condition precedent distinguishes Taylor's circumstance from that which we confronted in *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012). There we addressed a substantially similar agreement, but the difference is that the *Wigod* lender had fulfilled and discharged the condition precedent required for a trial-period agreement: Wells Fargo executed the TPP application by countersigning it and returning it to the borrower, Lori Wigod. See *id*. at 558. The issue presented in *Wigod* was instead whether Wells Fargo as lender later breached a contractual obligation under the TPP to follow through with a permanent loan modification. See *id*. at 561–62. Wells Fargo argued that because it had never sent

the borrower a final modification agreement (as contemplated by the executed TPP) it had never agreed to offer a permanent loan modification. See *id*. at 562–63. We were unpersuaded, explaining that "[o]nce Wells Fargo signed the TPP Agreement and returned it to Wigod, an objectively reasonable person would construe it as an offer to provide a permanent modification agreement if she fulfilled its conditions." *Id*. at 563. Here, however, Chase never signed and returned the TPP agreement.

What is more, in *Wigod* we did not understand the disputed language at issue there to create any sort of condition precedent. Wells Fargo argued to the contrary by relying on a provision in the TPP stating "that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until . . . I receive a fully executed copy of the Modification Agreement . . . ." *Id*. But that representation and condition assumed a contract to offer a permanent modification already had been formed—through the TPP agreement, which Wells Fargo executed by countersigning and returning it to Wigod—so we read the language to more properly characterize an obligation under that existing agreement. *Id*. By contrast, the language before us here unambiguously stated that the proposed TPP agreement "*will not take effect* unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature." (Emphasis added.) *Wigod*, in short, had no reason to answer whether the countersignature and return requirements were conditions precedent to the contract formation.

Chase never pre-committed to sending Taylor a countersigned copy of the TPP. Instead, it expressly reserved the right not to: "I understand that after I sign and return two copies of

this Plan to the Lender, the Lender will send me a signed copy
of this Plan if I qualify for the Offer or will send me written
notice that I do not qualify for the Offer." The countersigna-
ture was not an empty formality but rather, as *Wigod* ob-
served, "[Chase's] opportunity to determine whether [Taylor]
qualified" for HAMP relief. *Id*. at 562. For that reason, the TPP
reserved for Chase—in the form of a countersignature—a fi-
nal say before the contract came into existence. The condition
precedent was the legal mechanism for that reservation, and
Chase was entitled to rely on it.

Because the TPP never came into effect, it imposed no con-
tractual obligations on Chase. There were other constraints on
Chase's consideration of Taylor's loan modification request—
not the least of which were imposed by the federal HAMP
guidelines—but none could arise from the unsigned, ineffec-
tive TPP proposal.

B

Taylor contends that even if the countersignature is a con-
dition precedent, Chase waived it through the statements of
its employees and by accepting his reduced payments. Taylor
is right in his general observation that a party who benefits
from a condition precedent can waive it. See *Harrison
v. Thomas*, 761 N.E.2d 816, 819–20 (Ind. 2002). The waiver
need not be express, but instead can be inferred if the waiving
party shows an intent to perform its obligations under the
contract regardless of whether the condition has been met. See
*Parrish v. Terre Haute Sav. Bank*, 431 N.E.2d 132, 135–36 (Ind.
Ct. App. 1982) (concluding that a bank waived a signature re-
quirement by advancing a loan without first receiving signa-
tures).

But Taylor alleges no actions on Chase's part from which we could reasonably infer the bank intended to go through with the trial modification absent a countersignature. The allegations he does make—including that Chase employees told him his documents were "in receipt for processing" and they "did not know of" Chase ever returning fully executed copies of the TPP to customers—are consistent with an intent to insist on the condition precedent. Acknowledging that Taylor's submission was being processed did not promise him eligibility (regardless of whether he received the signed and returned TPP proposal), and neither did one employee's lack of knowledge about the process. The same is true of Taylor's conversation with the representative who said she was forwarding his documents to an analyst for "pre closing." The reference to pre closing implies that final approval was necessary before Chase would fulfill its duties under the TPP.

Nor does Chase's acceptance of Taylor's reduced payments plausibly establish waiver. Taylor argues that by accepting his lower remittances, Chase was performing as though the TPP agreement was in effect and he was successfully enrolled in the trial-modification phase. That the bank did so without having fulfilled the countersignature requirement, Taylor continues, suggests that Chase waived that condition precedent.

We see the reasonable inferences as running in the other direction. Taylor's position relies on an assumption that Chase would have rejected his partial payments if no trial modification was in effect. No allegations support that assumption and indeed the contention is implausible. By its terms, the TPP proposal made plain that Taylor would need to keep paying on his mortgage. More specifically, the TPP stated that Chase

would accept the modified and reduced payments whether or not Taylor ultimately qualified for permanent loan modification. Indeed, the Frequently Asked Questions document appended to the TPP application explained that if the bank found him ineligible for HAMP, Taylor's first trial period payment would "be applied to [his] existing loan in accordance with the terms of [his] loan documents." So Chase's decision to accept Taylor's trial period payments was not inconsistent with its intent to rely on the countersignature condition precedent and cannot establish waiver.

The Eighth Circuit's holding in *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843 (8th Cir. 2014), finding waiver of a similar countersignature requirement, does not assist Taylor. In *Topchian*, a bank employee assured the borrower that Chase had "accepted" his modification agreement and that the bank "would not send proof of this acceptance." *Id*. at 851–52. Taylor received no such unequivocal and affirmative disclaimer of Chase's intent to return a signed copy of the executed TPP agreement. And the *Topchian* borrower claimed that Chase accepted his reduced payments but, unlike Taylor, he also alleged that Chase's usual practice was to not accept anything less than the full payment amount. See *id*. at 851. The reasonable explanation for the change in course, then, was that Chase had accepted the modification, even without having returned the fully executed agreement. In Taylor's circumstance here, Chase expressly stated that it would accept partial payments even if he did not qualify for HAMP assistance.

With no waiver of the condition, and no fulfillment of it on Chase's part, the proposed TPP agreement never became an enforceable contract. That conclusion is the end of Taylor's contract claim because he can point to no other agreement

that Chase breached. Taylor's allegations, including those about the phone calls he had with bank representatives like Chris Montgomery, do not give rise to an oral or implied contract because they leave any agreement under those theories too vague to be enforceable. See *Town of Knightstown v. Wainscott*, 70 N.E.3d 450, 459 (Ind. Ct. App. 2017) ("To be valid and enforceable, a contract must be reasonably definite and certain."). Taylor's discussions with bank personnel cannot reasonably be viewed as binding Chase—with no accompanying writing of any kind—to each of the terms and conditions otherwise part of the TPP or, by extension, any agreement for a permanent mortgage modification. Seeing no contract, the district court was right to find no plausible claim.

## IV

Taylor's allegations could not support his other claims either. To hold Chase accountable under a theory of promissory estoppel, Taylor needed to allege that the bank made a definite promise to modify his loan. See *Grdinich v. Plan Comm'n for Town of Hebron*, 120 N.E.3d 269, 279 (Ind. Ct. App. 2019). He points to Chase's statement in the TPP that it would "modify [his] mortgage loan" if "he qualified," but that language did not convey a definite promise. The promise to modify Taylor's loan came with express strings—the bank's countersignature, for example—and those strings were disclosed to him. By its terms, the promise that Taylor invokes is conditioned on his qualification for the program. The proposed TPP agreement expressed Chase's provisional willingness to make a future commitment, not a definite promise to modify Taylor's mortgage. See *Tyler v. Trs. of Purdue Univ.*, 834 F. Supp. 2d 830, 848 (N.D. Ind. 2011) (observing that an expression of intention or desire is not a promise); *Sec. Bank & Tr. Co. v.*

*Bogard*, 494 N.E.2d 965, 968–69 (Ind. Ct. App. 1986) (determining that a bank employee's statement that he would submit an application to a "loan committee" was not a definite promise to approve a loan).

Taylor's proposed fraud claim required him to identify a misrepresentation that Chase made about "past or existing facts." See *Comfax Corp. v. N. Am. Van Lines, Inc.*, 587 N.E.2d 118, 125 (Ind. Ct. App. 1992). He has not done so. In the district court, Taylor relied on an allegation that the bank misrepresented his HAMP status to federal regulators, but on appeal he changes course and asserts that Chris Montgomery, a Chase supervisor, told him that "Chase would modify his loan if he qualified and completed the trial period," a promise he believes Chase "never intended" to keep. That characterization differs from what Taylor alleged in his proposed amended complaint, however. The allegations there were only that Montgomery told Taylor that his documents were "in receipt for processing" and two other employees told him they had "received" his documents and were "forwarding" them. In no way can these statements, even if credited as entirely true, be construed as Chase committing to a permanent loan modification in the future. See *Jones v. Oakland City Univ.*, 122 N.E.3d 911, 919 (Ind. Ct. App. 2019) ("Indiana law has not recognized a claim for fraud based on misrepresentation of the speaker's current intentions.") (internal quotation omitted). Put another way, Taylor did not point to a misrepresentation about what would happen in the future, and without a misrepresentation, there can be no fraud.

Finally, Chase's alleged conduct is not so "extreme and outrageous" as to amount to intentional infliction of emotional distress under Indiana law. See *Jaffri v. JPMorgan Chase*

*Bank, N.A.*, 26 N.E.3d 635, 639 (Ind. Ct. App. 2015). Taylor argues Chase did not process his loan modification in good faith and "intentionally" misled him about its status by, for example, asking him for the required documents after it had received them. *Jaffri* closed the door on liability for this claim under such a theory, holding that "any mishandling of" HAMP by a loan servicer, "even if intentional," did not establish the tort of emotional distress because the HAMP applicant's options "would have been even more limited" if the program were not in place. *Id*. at 640. We find that decision to be on all fours here and defer to Indiana's description of its own law.

*   *   *

We recruited the Georgetown Law Appellate Courts Immersion Clinic to represent Taylor on appeal, and they provided outstanding advocacy. In the end, though, we cannot conclude that the district court erred, either in dismissing Taylor's complaint or denying him the opportunity to amend, so we AFFIRM.

HAMILTON, *Circuit Judge*, dissenting. I respectfully dissent. Plaintiff Taylor alleged facts that support viable claims for breach of contract and promissory estoppel. In affirming dismissal, the majority opinion departs from the generous standard that applies on a motion to dismiss or for judgment on the pleadings under Rule 12(b)(6) or Rule 12(c), denying plaintiff the benefit of favorable inferences and instead granting them to Chase on several key points. See *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010) ("When evaluating the sufficiency of the complaint, we construe it in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in her favor."). I would reverse and remand for further proceedings.

I.   *The HAMP Program*

As our nation and the world face a new economic crisis triggered by the COVID-19 pandemic, this appeal brings us an echo from the last major economic crisis. In the depths of the Great Recession, in October 2008, the federal government offered a gigantic infusion of cash to the nation's nine largest financial institutions, including $25 billion to defendant JPMorgan Chase, through the emergency "Capital Purchase Program." See Adam Tooze, Crashed: How a Decade of Financial Crises Changed the World 197–99 (2019); Fin. Crisis Inquiry Comm'n, Financial Crisis Inquiry Report 373–74 (Jan. 2011). The banks had brought about the crisis by placing increasingly risky bets on mortgage-backed securities and the housing market that underlay them. See Financial Crisis Inquiry Report at 127–29.

The same legislation that authorized the Capital Purchase Program also directed the Secretary of the Treasury to implement HAMP to encourage mortgage servicers to minimize

foreclosures. 12 U.S.C. § 5219(a).[1] The government did not assume that banks—including those accepting billions of federal dollars to bail them out of the mess they had made—would participate in HAMP out of gratitude or a sense of civic duty. Instead, HAMP offered billions more in incentive payments and subsidies for the loan modifications. See Office of the Special Inspector Gen. for the Troubled Asset Relief Program, Quarterly Report to Congress 21 (Apr. 20, 2010). As of September 2019, Chase had received $3.2 billion in HAMP incentive payments since the program began. See Office the Special Inspector Gen., Semiannual Report to Congress 10 (Sept. 30, 2019).

HAMP fell far short of its goals. The experiences of plaintiff Anthony Taylor in this case may offer some insight as to why. "While Treasury originally estimated that 3 to 4 million people would be helped by these programs, only 550,000 borrowers had received permanent HAMP first-lien modifications as of November 30, 2010, and the number of borrowers starting trial modifications has been rapidly declining since October 2009." U.S. Gov't Accountability Off., GAO-11-288, Treasury Continues to Face Implementation Challenges and Data Weaknesses in Its Making Home Affordable Program 47 (Mar. 2011). A major factor in HAMP's "failure to reach its

---

[1] Servicer participation in HAMP was voluntary unless Fannie Mae or Freddie Mac owned the mortgage, even if the servicer was a bank that had taken Capital Purchase Program funds. See Making Home Affordable Program: Handbook for Servicers of Non-GSE Mortgages 11 (v.1.0 Aug. 19, 2010). In July 2009, Chase entered into an agreement with the federal government to offer loan modifications under HAMP. See *In re JPMorgan Chase Mortg. Modification Litig.*, 880 F. Supp. 2d 220, 226 (D. Mass. 2012).

intended scale" was "massive servicer [i.e., bank] noncompliance." Nat'l Consumer Law Ctr., At a Crossroads: Lessons from the Home Affordable Modification Program (HAMP) 30 (Jan. 2013).

Chase proved to be a particularly intransigent, or perhaps incompetent, HAMP participant. At the first step of the process, where homeowners applied for a Trial Period Plan, Chase denied 84 percent of applicants. See Office of the Special Inspector Gen., Quarterly Report to Congress 107 (July 29, 2015). For the few borrowers who cleared that first hurdle, Chase dragged out Trial Period Plans far longer than did other servicers. More important, it also denied permanent modifications in most cases.[2]

II. *Plaintiff's Experiences with Chase*

Plaintiff Anthony Taylor describes experiences with Chase that, against this larger background, do not seem atypical. In the HAMP program, Chase and other sophisticated banks seemed unable to process basic paperwork. See Lessons from HAMP at 31 ("Denials based on the failure of homeowners to submit documents—the largest single category of denials—are often not based on the homeowners' fail-

---

[2] Through December 2010, Chase TPPs lasted on average 7.8 months, and only 38 percent led to permanent modifications. No other servicer imposed longer trial periods on homeowners. See U.S. Dep't of the Treasury, Making Home Affordable Performance Report 6 (Dec. 2010). The Treasury Department withheld Chase's incentive payments for nine months spanning 2011 to 2012 to penalize its failures to comply with HAMP guidelines. See Press Release, Obama Administration Releases February Housing Scorecard (Mar. 2, 2012); Press Release, Obama Administration Releases May Housing Scorecard (June 9, 2011).

ure, but the servicers' failure to correctly process documents."). The inference most generous to Chase here is that Taylor was eligible for HAMP relief and that Chase just failed to process his case correctly.

Nevertheless, Chase argues, and the majority opinion accepts, that one sentence in the fine print of the HAMP documents nullified Chase's obligations and promises. The majority opinion errs in two basic ways: failing to consider the rest of the relevant documents, and failing to give Taylor the benefit of reasonable inferences from his allegations, including facts indicating that Chase itself did not treat its own formalities seriously. Taylor should be able to pursue his claims for breach of contract and promissory estoppel, as we found in *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012), and as our colleagues in other circuits have found in similar cases.

Like millions of Americans during the 2008–09 financial crisis, Taylor fell behind on his mortgage payments. In August 2009, Chris Montgomery of Chase called Taylor to sign him up for a HAMP loan modification. At that point, Taylor's housing expenses, including his mortgage payment, added up to about 64 percent of his monthly income, so he should have qualified for the HAMP program. (The cut-off was 31 percent.) Montgomery offered to enroll Taylor in the first step of HAMP, the three-month trial period.

Chase sent Taylor the documents needed to apply for the Trial Period Plan. They included a cover letter, a checklist of required financial documents, a sheet of Frequently Asked Questions, and the Trial Period Plan agreement itself. The cover page invited: "LET US KNOW THAT YOU ACCEPT

THIS OFFER," and the checklist instructed Taylor how "**to accept this offer**." (Bold in original.) The cover page told Taylor that he could "take advantage of this offer" by sending Chase monthly trial period payments, financial hardship documents (affidavit, tax returns, and a financial statement), and two signed copies of the TPP agreement. Finally, the checklist warned that failure to do so could void "**the offer made in the Trial Period Plan**." (Bold, again, in original).

Turning to the formal TPP agreement, it labeled itself "the Offer" on the first page. Just before the sentence on which the majority depends, the TPP said: "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me a written notice that I do not qualify for the Offer." Then came the sentence that the HAMP trial period would "not take effect unless and until" Chase confirmed that Taylor qualified by returning a signed copy of the TPP. The agreement also made clear that the TPP was meant to last three months and no longer. It provided for three trial period payments, due on the first of September, October, and November 2009. The first of December was defined as the "Modification Effective Date," when either the original mortgage terms would govern again or the modification would become permanent.

In September 2009, Taylor followed the instructions from Chase. He sent the required documents and initial payment to Chase by overnight mail, and he confirmed their delivery. A few days later, Taylor called Montgomery, the Chase employee who had first contacted him. Montgomery confirmed receipt. When Taylor asked about receiving back a signed copy of the TPP, Montgomery told him that he "did not know

of any situation in which Chase returns fully executed copies of TPP agreements to customers." Appellant's App. at 68A, 71A. A week later, Taylor called again and spoke to a different Chase employee, who also confirmed that Chase had received all the documents. And Chase accepted Taylor's first trial period payment for the reduced amount under the TPP. So far, so good.

In early October 2009, however, Taylor received two identical letters from Chase saying that his "Trial Plan offer" was at risk because he had not sent the needed documents. Taylor sent another package of the documents and again confirmed that Chase had received them. And Taylor kept making the reduced payments called for under the TPP. Taylor called again on November 2—after his third and final trial period payment—and was told by an employee named Barbara that his file would be forwarded "to an analyst for pre-closing." Appellant's App at 72A. Drawing a reasonable inference in Taylor's favor, this statement communicated that Chase was in the process of finalizing Taylor's permanent modification.

In early December 2009, however, Chase sent him two more form letters. These said again that Chase had not received his documents. He sent the documents off for the third time. This time, he included a letter explaining that this was the third package and that three employees had told him Chase already had them. He also asked Chase to send him its countersigned copy of the TPP. Chase confirmed receipt but did not otherwise respond.

On May 5, 2010—over five months after the Modification Effective Date—Chase sent Taylor a letter saying that he was not eligible for HAMP because his housing expenses did not exceed 31 percent of his gross monthly income. That further

mistake remains a mystery: Taylor's unmodified mortgage payments were about 64 percent of his gross monthly income, as shown by the documents he repeatedly sent to Chase. Chase then launched foreclosure proceedings. Sheriff sales were scheduled twice. After enduring that stress for years, Taylor eventually managed to stay in his home, though the sparse record tells us little about how.[3]

III. *Breach of Contract—A Factually Disputed Condition Precedent*

The majority opinion's analysis rests entirely on the theory that the "unless and until" sentence requiring Chase to return a countersigned copy of the TPP trumps everything else in the documents calling the proposed TPP an offer. The legal theory is that the sentence imposed a condition precedent to contract formation. Because Chase failed to return its copy before the TPP expired, the argument goes, no contract ever formed.

That conclusion is premature and requires resolving factual uncertainties in Chase's favor. Under Indiana law, the alleged failure of a condition precedent is an affirmative defense. See *Collins v. McKinney*, 871 N.E.2d 363, 369 n.3 (Ind. App. 2007). In general, courts should exercise caution before ruling on an affirmative defense on the pleadings, since they "typically turn on facts not before the court at that stage in the proceedings." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012); see also *Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012) ("Judges should respect the norm

---

[3] A more complete account of the facts might cast Chase in a more favorable light. In oral argument, counsel for Chase strayed far outside the record to explain how well Chase had treated Taylor, at least in the end. Of course, in an appeal from a dismissal under Rule 12(b)(6) or Rule 12(c), we can neither credit nor consider such soothing assurances.

that complaints need not anticipate or meet potential affirmative defenses."). That's the case here. At least two major questions about the purported condition precedent remain factually disputed. They should not be resolved on the pleadings. Taylor has alleged sufficiently that if Chase had complied with its promises and the requirements of the HAMP program, he would have received a permanent modification of his mortgage and avoided years of foreclosure and stress.

A. *Scope of the Countersignature Requirement*

First, the majority resolves doubts in Chase's favor to construe the condition precedent as broadly as possible, inferring that it gave Chase the right to deny applicants for any reason or no reason at all. Ante at 10. In Indiana, conditions precedent "are disfavored and must be stated explicitly within the contract." *Scott-Reitz Ltd. v. Rein Warsaw Assocs.*, 658 N.E.2d 98, 103 (Ind. App. 1995). But the countersignature requirement did not explicitly reserve to Chase the right to indulge its whims. On the contrary, Chase had already promised to apply objective criteria established by the Treasury Department to the information Taylor provided: "If you qualify *under the federal government's Home Affordable Modification program* and comply with the terms of the Trial Period Plan, we *will modify your mortgage loan* and you can avoid foreclosure." Appellant's App. at 28A (emphasis added). This language can easily be read to incorporate by reference the federal eligibility guidelines, as contracts commonly do. See, e.g., *Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 754 (Ind. 2018). Treasury's first HAMP directive from April 6, 2009, before the events of this case, set forth a list of straightforward criteria to

determine HAMP eligibility. Those criteria did not include "if the mortgage servicer feels like it."[4]

Not even Chase agrees with the majority that the countersignature requirement gave it a pocket veto over modifications for qualified homeowners. On appeal, Chase describes the TPP as "an application to *possibly* get [a modification] in the future, *if one qualifies*." Appellee's Br. at 17 (second emphasis added). At oral argument, Chase disavowed the notion that it "was reserving discretion" in determining whether borrowers qualified "under HAMP." Everyone except the majority agrees that the inquiry was an objective one.

On the basis of this objective inquiry, Chase committed to do one of two things when Taylor sent in his signed copy of the TPP: It would either "send me [Taylor] a signed copy of this Plan *if I qualify for the Offer* or will send me written notice that I do not qualify for the Offer." Appellant's App. at 33A (emphasis added); see also ante at 12 (quoting this passage of the agreement). But Chase did neither. It responded only many months later, long after the expiration of the TPP by its terms, to say *incorrectly* that Taylor did not qualify. The majority compares Chase to a car buyer who walks away because the transmission turns out to be shot. Ante at 9. But Taylor has pleaded that his car's transmission was working just fine. Only the most expansive reading of the purported condition precedent allows the majority to dismiss Taylor's suit at this early stage, before any factual development on how Chase applied the countersignature requirement.

---

[4] See Supplemental Directive 09-01 (Apr. 6, 2009), https://www.hmpadmin.com/portal/programs/docs/hamp_sevicer/sd0901.pdf.

B. *Waiver of Condition Precedent*

The second unresolved question evident from the pleadings is even more fact-intensive: whether Chase's actions and statements waived the condition precedent. Recall that Taylor noticed that Chase was supposed to return a signed copy of the TPP to him. He asked Chase for it several times. The first person he talked to, Chris Montgomery, responded that he "did not know of any situation in which Chase returns fully executed copies of TPP agreements to customers." Appellant's App. at 68A, 71A. Later, when Taylor sent his documents for the third time and again asked for return of a countersigned copy, Chase did not bother to answer. And recall that Chase had accepted without comment or objection the three monthly payments at the lower amount under the TPP that Chase had offered.

It's not difficult to infer from this story that Chase did not actually care whether it returned a countersigned copy of the TPP and thus waived the condition precedent. The majority opinion correctly acknowledges that Chase could waive it. Ante at 12, citing *Harrison v. Thomas*, 761 N.E.2d 816, 819–20 (Ind. 2002) ("It has long been the law in this state that [t]he performance of a condition precedent may be waived in many ways. One such way is by the conduct of one of the parties to the contract." (citations omitted)). Indiana courts have specifically cited accepting payments without complaint as one way to waive a condition precedent. See, e.g., *Indiana Hotel Equities, LLC v. Indianapolis Airport Auth.*, 122 N.E.3d 901, 910 (Ind. App. 2019) ("Generally, if a party to a contract performs acts that recognize the contract as still subsisting, such as accepting rent payments, specific performance of the terms of the contract is waived … ."); *Snyder v. Int'l Harvester Credit Corp.*,

261 N.E.2d 71, 75 (Ind. App. 1970) ("[W]hen appellee accepted payments made by appellant … it recognized the contract as still in effect and waived any right it might have had for foreclosure.").

Our analysis should end there, at least on the pleadings. A viable legal theory and factual allegations that track the theory are enough to survive a motion under Rule 12 in federal court. "A complaint that invokes a recognized legal theory (as this one does) and contains plausible allegations on the material issues (as this one does) cannot be dismissed under Rule 12." *Richards*, 696 F.3d at 638. More specifically, under federal law, waiver usually raises a question of fact not amenable to resolution on the pleadings. See *Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1140 (7th Cir. 2009) ("[I]f the facts necessary to constitute waiver are in dispute or if reasonable minds might differ as to the inferences to be drawn from the undisputed evidence, then the issue becomes a question of fact."); *Stewart v. Meyers*, 353 F.2d 691, 694 (7th Cir. 1965) ("Although the question as to what facts are sufficient to constitute a waiver is a question of law, the question whether such facts exist in any given case is a question of fact for the jury.").

To avoid giving Taylor the benefit of the inference of waiver, however, the majority opinion offers two principal rebuttals. Neither is consistent with the standard for granting or reviewing a judgment on the pleadings.

First, the majority opinion parses the allegation about what Chris Montgomery told Taylor concerning the condition precedent. Montgomery did not say in so many words that Chase did not care about the countersignature requirement, only that he "did not know of any situation in which Chase

returns fully executed copies of TPP agreements." He was just one employee, says the majority. Perhaps Chase was actually returning countersigned TPP agreements and adhering scrupulously to its fine print. Ante at 12–13.

With respect, this rationale flips the usual standard for judgment on the pleadings. It gives movant Chase the benefit of favorable inferences and denies that benefit to non-movant Taylor. This case is old but still at the pleadings stage. Taylor has not yet had the opportunity to do any discovery about how often Chase stuck to its fine print in other cases: he just knows that, in his case, Chase seems not to have been worried about correctly and strictly handling the documents drafted so carefully by its lawyers. At the pleadings stage, the reasonable inference favorable to Taylor starts with the premise that Montgomery was an authorized agent for Chase, an employee who specialized in processing documents under the new HAMP program. When Taylor asked about getting a signed copy back, Montgomery did not say that he could not make any promises or that it would depend on other people. He said that he did not know of any instance where Chase bothered to comply with the purported condition precedent.

Consider the situation from Taylor's point of view. The bank had told him that he would qualify for HAMP if the information was still accurate. He knew that it was. The bank did not want to take the trouble of sending him a countersigned copy of the offer it had extended to him in the first place. The bank was also accepting without complaint all of the reduced payments the bank itself had offered.

Those payments bring up the majority opinion's second rationale. We should not read anything into acceptance of the reduced payments because the sheet of Frequently Asked

Questions said that if Chase found he was not eligible for
HAMP, his *first* trial period payment would be applied to his
existing loan. Ante at 14, quoting Appellant's App. at 32A.
The majority opinion then overlooks the singular—first pay-
ment—and reads this statement in favor of Chase: "So
Chase's decision to accept Taylor's trial period payment*s*
[plural, i.e., *all* of them] was not inconsistent with its intent to
rely on the countersignature condition precedent … ." Ante at
14. The majority also overlooks another promise Chase made
on that same page: to "process" Taylor's "modification re-
quest" within "up to 30 days," that is, within *at most 30 days*.
When Chase continued accepting reduced payments beyond
the first month, until the three-month trial period ended, Tay-
lor could have fairly concluded that he qualified for modifi-
cation.

Contract law does not depend on subjective intentions. It
depends on objective manifestations of intent in words and
actions. E.g., *Empro Mfg. Co. v. Ball–Co Mfg., Inc.*, 870 F.2d 423,
425 (7th Cir. 1989); *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810,
814–15 (7th Cir. 1987). Taylor need not prove, and courts need
not search for, some true institutional intention of the bank.

We look instead at the objective manifestations—Chase's
actions and its communications with Taylor. It sent him a
package of documents that looked like a binding offer to mod-
ify his mortgage according to the terms of this new, massive
federal rescue program. One sentence of the documents set
out the countersignature condition precedent. But Chase's
later statements and actions can easily, and surely plausibly,
be interpreted as not caring whether it had bothered to return
that signed copy of the modified agreement. When Taylor
asked about it, he was told by the bank's chosen agents that

they did not know of the bank ever fulfilling that condition, and the bank accepted not just his first but all three of his reduced payments, all without complaint. Add in the fact that the bank seemed incapable of keeping track of at least two of the three packages of documents Taylor sent them. It is reasonable to infer that the bank manifested an intention to dispense with the extra paperwork of returning a signed copy of the TPP agreement, especially where we must assume there was no legitimate reason to reject Taylor's application.

C. *Prior Case Law*

This case is thus similar to our decision in *Wigod v. Wells Fargo* and the decisions in *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843 (8th Cir. 2014), *Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878 (9th Cir. 2013), and other federal appellate cases that have applied general principles of contract law to recognize the commitments banks made to homeowners by offering HAMP modifications.

In *Wigod*, Wells Fargo and the homeowner agreed to a TPP, and Wells Fargo did return a signed copy of the initial TPP agreement. 673 F.3d at 558. The dispute came at the next step: whether the parties had entered into a binding permanent modification of the mortgage. Wells Fargo relied on another "unless and until" provision nearly identical to the term Chase and the majority opinion rely on here. The TPP agreement said that the permanent modification would not take effect "unless and until … [the borrower] receive[s] a fully executed copy of the Modification Agreement." *Id.* at 563 & n.6; see also Appellant's App. at 34A (same phrasing in Taylor's TPP). Wells Fargo argued, as Chase does here, that because it never sent the borrower a fully executed copy of the final

modification, the condition precedent was not satisfied, and no contract had formed.

We reversed dismissal in *Wigod* on grounds that apply here as well: Wells Fargo did not have unbridled discretion to withhold an executed copy of the TPP for a qualified borrower. We squarely rejected the notion that Wells Fargo "could simply refuse to send the Modification Agreement for any reason whatsoever—interest rates went up, the economy soured, it just didn't like Wigod." 673 F.3d at 563. HAMP qualification standards were objective, not discretionary with participating banks like Chase. Because Taylor, we must assume, qualified for and complied with the offered terms of the TPP, he is also entitled to the assumption that he also would have qualified for a permanent modification of his loan, as in *Wigod*. The Ninth Circuit was correct when it explained that *Wigod* did not turn on whether the bank returned a countersigned TPP to the borrower "but instead on the bank's failure to tell the borrowers that they did not qualify." *Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878, 884 (9th Cir. 2013).

Similarly, in *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 851 (8th Cir. 2014), the Eighth Circuit reversed dismissal of a claim on grounds that simply cannot be distinguished from this case. In *Topchian*, the borrower successfully enrolled in a TPP, complied with its terms, and expected a permanent modification of the loan. *Id.* at 846–47. Chase argued that there was no permanent modification because it had never returned a signed modification agreement, again characterizing its countersignature as a condition precedent. The Eighth Circuit followed *Wigod*, reasoning that the condition precedent benefited Chase and that the plaintiff had alleged facts sufficient for waiver. *Id.* at 850–51. Distinguishing

the allegations of waiver in *Topchian* from those here requires a level of hair-splitting not appropriate on the pleadings, if ever. The majority draws a distinction *as a matter of law* between two statements by Chase: "would not send proof of this acceptance" (*Topchian*) and "did not know of any situation in which Chase returns fully executed copies" (this case). Ante at 14. Perhaps the former is a bit more emphatic. Such trivial differences might have had legal significance in the bygone days of code pleading, but should not today.[5]

And similarly, in *Corvello v. Wells Fargo*, the borrowers sent in a signed TPP and complied with its terms by making the required payments and otherwise remaining qualified for permanent modification. 728 F.3d at 882. As in this case, the bank argued that there was no binding TPP, let alone an agreement for permanent modification, because it had never returned a countersigned TPP to the borrowers. *Id.* at 884. The Ninth Circuit rejected both that argument and the attempt to distinguish *Wigod* on that factual basis. Since the borrowers complied with the requirements, they could proceed with their breach of contract claims, notwithstanding Wells Fargo's failure either to return a document or to notify the borrowers that they did not qualify. *Id.* at 884–85. The majority does not discuss *Corvello*, even though its facts are precisely on point.

---

[5] In any event, the Eighth Circuit paraphrased the *Topchian* complaint. The actual pro se pleading read: "Plaintiff was assured by [Chase's employee] that the agreement is accepted, but denied to send a proof, which, by the Plaintiff understands should have been one of two copies of the HAMP agreement, signed by Plaintiff and CHASE." Amended Complaint ¶ 10, *Topchian v. JPMorgan Chase Bank, N.A.*, No. 4:12-cv-00910-ODS (W.D. Mo. Apr. 16, 2013), ECF. No. 10. The majority opinion not only strays from the Rule 12 standard but also relies on incorrect facts.

And also similarly, in *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224 (1st Cir. 2013), the bank tried to defeat a breach of contract claim based on the "unless and until" clause at the permanent modification stage. The First Circuit reversed on that claim, reasoning that the documents could not be read to give the bank an "unfettered" right to deny a modification where the borrower accepted the offer, qualified for modification, and complied with the TPP. *Id*. at 235. See also *Oskoui v. J.P. Morgan Chase Bank, N.A.*, 851 F.3d 851, 859 (9th Cir. 2017) ("Once [the plaintiff] made her three payments, Chase was obligated by the explicit language of its offer [in the TPP] to send her *an Agreement* for her signature 'which will modify the loan as necessary to reflect this new payment amount.' … Chase must abide by its own language."); *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1260 (10th Cir. 2016) ("[W]e conclude that the language in [the servicer's] TPP documents clearly and unambiguously promises to provide permanent HAMP loan modifications to borrowers who comply with the terms of their TPPs.").

In retreating from *Wigod* and these similar decisions in other circuits, the majority opinion departs from normal pleading standards to enforce a harsh and unrealistic formalism. The banks and mortgage servicers who participated in HAMP received billions in federal dollars to save them from their own devastating mistakes. The federal government tried to help qualified homeowners, too. The majority's erroneous formalism, however, endorses the banks' actions that left too many homeowners behind during that financial crisis.

IV. *Promissory Estoppel*

Apart from Taylor's claim for breach of contract, including Chase's waiver of the condition precedent, Taylor also stated

a viable claim for promissory estoppel as an alternative. See *Wigod*, 673 F.3d at 566 & n.8. Indiana recognizes promissory estoppel, of course. See, e.g., *Brown v. Branch*, 758 N.E.2d 48, 52 (Ind. 2001); *First Nat'l Bank of Logansport v. Logan Mfg. Co.*, 577 N.E.2d 949, 954 (Ind. 1991); *Turner v. Nationstar Mortgage, LLC*, 45 N.E.3d 1257, 1263 (Ind. App. 2015). The claim has five elements: "(1) a promise by the promissor; (2) made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise." *Brown*, 758 N.E.2d at 52.

Chase's offer to Taylor could reasonably be understood as a promise to modify his mortgage according to the stated terms if he qualified, which we must assume he did. To avoid finding a promise, the majority opinion again cites the counter-signature requirement. Ante at 15. As explained above, that condition did not grant Chase discretion to deny the modification for any reason whatsoever. In any case, a key feature of Indiana promissory estoppel is that the promise "need not be as clear as a contractual promise would have to be in order to be enforceable." *Garwood Packaging, Inc. v. Allen & Co.*, 378 F.3d 698, 702 (7th Cir. 2004) (Indiana law), citing *Logansport*, 557 N.E.2d at 955; see also *In re Fort Wayne Telsat, Inc.*, 665 F.3d 816, 819 (7th Cir. 2011) (same, citing *Garwood*). The majority opinion nevertheless insists that a promise must be especially "definite" to qualify for promissory estoppel. Ante at 15. But the Indiana cases it cites do not contain that requirement. See *Grdinich v. Plan Comm'n for Town of Hebron*, 120 N.E.3d 269, 279 (Ind. App. 2019) (requiring definite *reliance*, not a definite *promise*); *Sec. Bank & Tr. Co. v. Bogard*, 494 N.E.2d 965, 968 (Ind. App. 1986) (same).

The more difficult challenge for a plaintiff is usually to show reasonable, definite, and substantial reliance. E.g., *Turner*, 45 N.E.3d at 1265 (finding no "reasonable" reliance where borrower incurred reliance costs *before* making the adjusted mortgage payment). On the other hand, the Indiana Supreme Court found that plaintiffs had met this challenge in the *Logansport* case because they incurred financial losses and took other actions in anticipation of receiving a line of credit. 577 N.E.2d at 955. Here, after Taylor sent in the third set of documents and three reduced payments, Chase took no further action. He reasonably assumed he could rely on Chase's promise to modify at that point, consistent with the federal HAMP requirements, to which Chase had agreed. See *Wigod*, 673 F.3d at 566. Taylor also alleges that, in reliance on Chase's actions indicating that the TPP was in place and that he would be able to modify his mortgage permanently, he did not pursue alternative forms of relief, such as other loans or even bankruptcy protection. Appellant's App. at 26A ¶ 76. These detriments in the form of forgone alternatives could constitute definite and substantial reliance.

For these reasons, I would reverse the dismissal of Taylor's claims for breach of contract and promissory estoppel so that those claims could be decided on the basis of evidence rather than allegations and dueling inferences.